# CIRCUIT COURT OF BALTIMORE CITY.

Filed July 5, 1906.

FRANK M. FLACK ET AL.
VS.
THE MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

*Bernard Carter* and *Isaac Lobe Straus* for plaintiffs.
*J. M. Head, Albert C. Ritchie* and *Sylvan H. Lauchheimer* for defendants.

STOCKBRIDGE, J.—

The bill in this case is filed by a taxpayer for an injunction, prohibitory to the extent of restraining the War-

ren Brothers' Company and the Mayor and City Council of Baltimore from carrying out a contract entered into for the paving of Twenty-fifth street from the York road to Oak street, and mandatory to the extent of requiring the contract entered into to be delivered up for cancellation and canceled.

Both phases of the relief sought have their origin in an alleged invalidity of the contract.

The first ground assigned is the supposed unconstitutionality of Section 10 of Chapter 274 of the Acts of 1904.

Two reasons for this have been suggested, or to be more precise, two different methods of stating the same objection. First, a supposed repugnancy between provisions of Section 10 and other portions of the Act, and also the title of the Act; and second, that the title of the Act itself is not properly descriptive of the subject-matter of the contents. This objection has been very fully and ably argued by counsel for both parties, but without reviewing those arguments or specifically enumerating the reasons, the court is of opinion that the section referred to, and its relations alike to the title, and the previous provisions of the Act, comes directly within the line of the decisions in the cases of the Mayor vs. Reitz, 50 Md., 574; Drennen vs. Banks, 80 Md., 310; Hamilton vs. Carroll, 82 Md., 326; and Price vs. Liquor Commissioners, 98 Md., 346, and the validity of Section 10 must be sustained.

Regarding this Chapter 274 of the Acts of 1904, as an exercise of legislative power valid in all its parts, what follows?

Provision is made by the Act for raising, upon the approval of the voters of the city of Baltimore, a specified sum of money to be expended in the condemning, opening, grading, paving and curbing of streets in a certain section of Baltimore city, and the machinery is provided by which this work shall be carried on, either by a Commission under the provisions of Section 2, or by the Commissioners for Opening Streets under Section 10. By Ordinance No. 216 of 1905, in the exercise of the power provided by Section 10, the Commissioners for Opening Streets was selected as the municipal agency for the performance of the functions and exercise of the powers granted by

the Act. By the terms of that section it is expressly provided that: "The Mayor and City Council may, by ordinance, authorize and empower the Commissioners for Opening Streets of Baltimore city to perform the duties and functions in this bill heretofore provided for the said Commission."

When this selection of the agency through which the work was to be performed had been made by the passage of the ordinance, it followed that the Commissioners for Opening Streets were vested with the "duties and functions" in the Act specifically provided with reference to the Commission, and that necessarily carried with it the powers of such Commission and the exercise of them by the Commissioners for Opening Streets. It was contended in argument that the effect of the ordinance was to limit the powers which could be exercised by the Commissioners for Opening Streets, but that is clearly not tenable, because, to give such a construction, would be tantamount to saying that the Mayor and City Council of Baltimore could, by ordinance, limit and curtail the powers which had been granted by the General Assembly.

The question, therefore, which is of prime importance in connection with this phase of the case is, what powers were, by the General Assembly, granted to the commission? It is immaterial whether those powers were, or were not, in accord with previously established modes of procedure, sanctioned by ordinance, since the grant of power by the General Assembly must necessarily override the provisions of any ordinance, whether general or special, which might be inconsistent with such grant of power. The powers of the commission are to be found in the third section of the Act, and embrace among others, to "grade and pave any street, avenue, lane or alley, or any part thereof, from curb to curb," * * * "that such commission shall have all powers necessary and proper in the exercise of said powers." Here then is to be found, first, an express grant of certain definite powers, followed by a grant not of implied powers, but of the powers incidental to the exercise of the expressed powers, and the section closes with authority to the Mayor and City Council to grant, by ordinance, further powers still in the proper execution of the act. There is no

concern at this time with this last clause, only with the first two. The proposed contract in the present case is one to pave Twenty-fifth street. That is an exercise of one of the express powers granted by the Act. Did, then, the Commission, under the clause embodying powers incidental to the express powers, have the authority to select, of its own initiative, the character of pavement which was to be laid upon the street? It is not a question of whether the Commissioners for Opening Streets, acting as an Annex Commission, selected wisely or the reverse. That was a discretionary matter, which the court will not review. The sole question is, was that a power incidental to the exercise of the express power, and the main object of the Act?

It has been argued with great force, that the provisions of the City Charter are to be read into the Act. This is true in so far as there is no conflict between the provisions of the Act and the provisions of the City Charter; but where there is a conflict, it is difficult to see upon what principle of construction it could be claimed that the City Charter enacted in 1898 could operate to repeal or nullify the Act passed in 1904. To illustrate what is meant: Sections 827 and 828 of the City Charter make provision for the opening of streets, and that provision is entirely different from the provisions contained in Section 3 of the Act, and if the Charter provisions, and not the Act control, then the Commission is virtually stripped of the most important power designed to be given by the Act.

Again, Section 7 of the Act authorizes the commission itself to contract directly for the doing of the work authorized by the Act. Sections 14 and 15 of the City Charter make full and complete provision for the letting of municipal contracts by competitive bidding. Does the Charter operate to repeal the provision of the Act of 1904, in this particular, vice versa? It seems to me that the true interpretation is that neither was any repeal of the other, but the one supplemental of the other, affording an alternative method. Then if the contract to be let was one upon which there was not to be any competition, the commission was vested with adequate power to act, while on the other hand, if it was to be awarded as the result of competition, the charter made full

provision for the method to be pursued.

But if the provisions of the City Charter can only be read into the Act to a limited extent, still less can the provisions of ordinances of the Mayor and City Council of Baltimore be read into the Act. For the paving of streets certain methods have been provided by law. These are, first, by the passage of an ordinance by the Mayor and City Council of Baltimore, which may define the street, the character of pavement to be used, how the work shall be done, whether by contract or by day's labor, how the expense shall be provided for, whether by the municipality, the abutting property owners, or divided between the municipality, and the abutting property owners; or, second, in accordance with the provisions of Section 30 of the Baltimore City Code, upon request of the property holders, in which case the expense is to be borne by them, and the procedure defined; or, third, by direction of the City Engineer for the abatement of a nuisance; or fourth, within the territory covered by the Act by the Commission, provided for by Chapter 274. I do not see how it is possible that this Act and the powers granted to the Commission can be limited, either by the Ordinance No. 165, approved February 24, 1899, or by the Ordinance No. 216, approved March 6th, 1905. To give such a construction would be to say that the Act of the legislature was passed and is to be taken, not merely in connection with the Charter of the municipality, but subject to ordinances passed, or to be passed by the Mayor and City Council of Baltimore, a limitation of which there is no suggestion whatever in the Act.

This Act of 1904 confers powers of a most unusual and ample nature. For example: The Commission, by Section 3, is given the right of condemnation. Section 5, it is true, confers, in addition, a power upon the municipal corporation to condemn property, but there is nothing to indicate that this was in any way intended to interfere with or limit the power previously conferred upon the Commission; on the contrary, it was apparently the intent of the legislature, after having given a power of condemnation to the Commission, to add thereto an auxili-

ary or supplemental power to the same
end in the municipality.

So, too, in Section 7, provision is
made that the payment of contractors
is to be made for work done under con-
tracts, which the Commission is author-
ized to enter into, upon the approval of
the Commission or its Chairman, with-
out other check. In an Act of this
character, what is the reasonable in-
terpretation to be placed on the inci-
dental powers embodied in Section 3?
Manifestly, as it seems to the court, it
was the intent to clothe this body with
each and every of the powers which
might be, or become necessary to exe-
cute the express powers previously
granted, and when the question was
one of paving, the three elements
which lay at the very threshold of the
undertaking were, the street where the
paving was to be done, and the mate-
rial or character of pavement to be
used, and whether the same should be
done by contract or by day's labor. An
answer to each of these was an abso-
lute essential to the exercise of the
express power, and therefore, in the
view of the court, the Commissioners
for the Opening of Streets, in their ca-
pacity of the Annex Commission, were
fully empowered to select the kind or
character of pavement to be employed,
and so far as this ground of objection
to the contract is concerned, it can not
prevail.

Another of the grounds upon which
the plaintiffs in this proceeding seek
to have the contract for the paving of
Twenty-fifth street set aside is, for the
alleged non-compliance upon the part
of the municipal officials with Sections
14 and 15 of the City Charter. With-
out reciting these at length, the general
intent of these sections may be said to
be, that upon all contract work done
for the city the contract shall be en-
tered into as the result of competitive
bidding, in cases where the amount in-
volved is in excess of $500—and the
allegation in this case, is that there
was no competition such as these sec-
tions contemplate in the awarding of
this contract.

What then is meant by competition?
It is manifest that competition may be
of two kinds, each radically different
from the other, and yet each in every
proper sense of the word, competitive.
The first of these is where, upon a defi-
nite and specific set of specifications,
providing the nature, kind and char-

acter of work to be done, and materials
to be employed upon any given under-
taking, different firms, individuals or
corporations bid for one and the same
identical thing. In this sense of the
term, it is assumed by the plaintiffs
that without express legislative sanc-
tion the city can not purchase or con-
tract for an article upon which there
is a patent or the vending of which, is
the subject matter of a monopoly.

Such a construction is not tenable.
There are many and important requi-
sites of a municipality which are the
subject matter of patent, or within the
control of but a single manufacturer or
vendor, but which it has been here,
and in every other important munici-
pality, fully recognized were proper
subjects for acquisition by the city
authorities.

Familiar illustrations of these are to
be found in the contracts with gas com-
panies for the light of streets; of elec-
tric light corporations for the same
purpose; of telephone companies of
contracts with reference to the con-
trolling of patents for fire alarm tele-
graphs, and for the mechanical appli-
ances employed for various public utili-
ties; and the power of a municipality
in all such cases to contract, either for
the materials, the manufactures or ser-
vices has been too long and too uni-
versally recognized, even in cases where
there has been no specific legislative
grant of power to regard that question
as longer debatable.

In many of these cases, such a thing
as competition is simply impossible;
while in others, there may be an ele-
ment of competition, as, for example,
where an article which may be pro-
tected either by letters patent, or by a
trade-mark, is required as one of the
elements in the doing of municipal
work, but to which must be added
other materials not so protected, to-
gether with the necessary labor of
manufacturing or combining, a quali-
fied competition may result. That was
apparently the thought, or motive,
which prompted the proposition of the
Warren Brothers' Company to furnish
certain materials and a certain per-
centage of the manufacture for the
proposed pavement, to all contractors
on the basis of $1.45 per square yard.
In such a case, the real competition,
of course, begins at the point where
the person controlling the article pro-
tected by patent or trade-mark delivers

the same to a contractor for the specific work, and from this point on in such a case, there might result a competition.

When, however, the party owning or controlling the article protected by patent or trade-mark, enters into competition in the bidding with those to whom it is proposed to sell the product of the company, then competition virtually ceases, and in order to have any true competition where a proposition like the $1.45 offer in this case has been made, there must be the elimination from those competing in bidding, the individual, firm or corporation controlling the protected article, and his, or its agents, representatives or subsidiary companies.

In the present case it was undoubtedly competent (the other necessary steps having been properly taken) for the Mayor and City Council of Baltimore to have contracted for the bitulithic pavement directly with Warren Brothers, provided a price and specifications could be mutually agreed upon without the advertising for bids, but by the very fact of advertising for proposals the city elected to proceed with the paving of Twenty-fifth street by means of competitive bidding, in accordance with Sections 14 and 15 of the City Charter, which election it had an undoubted right to make. Since, however, under the form of competition thus far discussed, the conditions were not such as to admit of any competitive bidding in fact, and the city being bound by its election made the prayer of the plaintiff's bill would have to be granted unless, under competition of the other character, there be something to alter the situation.

A second class of competitive bids is where an individual, firm or corporation invites bids or proposals, not for the doing of the same identical work as in the first kind of competition already discussed, but for the doing of a certain work which shall accomplish certain results, in accordance with certain definite requirements.

To illustrate: If today the city had occasion to construct a bridge at any point, it might well invite proposals for a bridge of any one of the following types: A Truss, a Cantilever or a Suspension bridge, to have a certain width, capable of sustaining a certain prescribed load, together with such other requirements as the municipal author-

ities might deem requisite in such a structure to adequately meet the public needs.

The design, the mode of construction of the three would be entirely different. Persons tendering bids would necessarily proceed from different bases, and yet all might fairly be said to be in competition with one another. This view has been strenuously opposed in the argument as not having met the approval of the Court of Appeals as laid down in the case of Packard vs. Hayes, 94 Md., 233. I do not, however, understand that decision as going to the extent claimed for it by the plaintiffs in this case.

In Packard vs. Hayes, the bids as submitted for the removal and disposal of the garbage contained practically no requirement of any sort, shape or description. The entire subject was in every particular left to the option of the bidders and contractors, and being so left there was nothing whatever necessarily in common between the bids invited, and of course, where there was no common element whatever, there could be no competition.

Taking this view, it appears to the court, that if in the judgment of the proper municipal authorities, the desired character of pavement upon Twenty-fifth street could be obtained equally as well by the use of asphalt blocks, bitulithic or vitrified brick, under proper specifications with regard to each, they might be fairly placed in competition, but, when so placed, in competition, all power of selection or election as between the several kinds thus placed in competition, was gone, and it then became the plain, positive duty, when bids had been submitted upon those bases, to award the contract to the lowest bidder for any one of the three, provided only that he was responsible.

In the present case, assuming the competition to have been one of this character, and the character which, in the view of the court, afforded a fair and legitimate basis for competition, the bidder for vitrified brick filed the lowest bid, and unless the municipal authorities had good reason to believe that such bidder was irresponsible and unable to comply with the terms of his contract, he was entitled to the award.

There is no pretense, either in the pleadings or in the evidence, that the

bid for vitrified brick was passed over because of the irresponsibility of the bidder, but by the minutes of the Board of Awards and the Commissioners for Opening Streets, it appears that after having invited bids under which different methods of paving were placed in competition with one another, the competition was then abandoned, and the award made irrespective of it. Again, as in the first kind of competition, the city having made its election to invite competitive bids was bound by it, and it had not the power after having invited the bids, received the proposals and opened them, to then abandon the very competition which it had itself inaugurated, and award the contract irrespective of that competition. Under this form of competition, therefore, equally with the first, the awarding and execution of the contract was ultra vires and void.

A decree will be signed in accordance with the foregoing views granting the relief prayed in the plaintiffs' bill.